**EXHIBIT A**

**EXHIBIT A**

FILED
4th JUDICIAL DISTRICT COURT
San Miguel County
4/15/2025 2:07 PM
CLERK OF THE COURT
CD

STATE OF NEW MEXICO
COUNTY OF SAN MIGUEL
FOURTH JUDICIAL DISTRICT COURT

EUGENIO S. MATHIS, as Personal
Representative of the ESTATE OF JAMES
RAMIREZ, deceased,

      Plaintiff,

v.                                No. D-412-CV-2023-00241

CORECIVIC OF TENNESSEE, d/b/a
CORECIVIC, INC.; CIBOLA GENERAL
HOSPITAL, INC.; JOSEPH R. BOUNDS, RN;
JOSHUA LARSON, MD; CORRECTIONAL
MEDICINE ASSOCIATES, P.C. and
KEITH IVENS, MD,

      Defendants.

**FIRST AMENDED COMPLAINT FOR MEDICAL MALPRACTICE, WRONGFUL
DEATH, AND RELATED CLAIMS**

COMES NOW, the Plaintiff, Eugenio S. Mathis, as Personal Representative of the Estate
of James Ramirez, by and through his attorneys Collins and Collins, P.C. (Parrish Collins) and
Rebekah Wright and Guebert Gentile Piazza & Junker P.C. (Elizabeth M. Piazza and Anne L.
Kemp), and for his cause of action states as follows:

## I.     INTRODUCTION

James Ramirez was a pre-adjudication detainee in the custody of CoreCivic at Cibola
County Correctional Center ("CCCC"), awaiting transfer to a mental health treatment facility.
Upon information and belief, Correctional Medicine Associates, P.C. ("CMA") provided certain
medical personnel and supervision to CoreCivic medical staff at CCCC. Mr. Ramirez had a
documented history of schizophrenia with paranoia, including prior hospitalizations. CoreCivic

and CMA personnel were aware of Mr. Ramirez's diagnosis of paranoid chronic schizophrenia, and that Mr. Ramirez had been deemed incompetent to stand trial just days before.

Camera footage shows that Mr. Ramirez was having a severe medical and/or mental health crisis on the morning of February 14, 2022, hours before he was to be transferred from CCCC custody to receive medical help for schizophrenia. Mr. Ramirez was behaving bizarrely. He was unable to stand even when using the concrete bench bed or the sink for support. He fell, repeatedly striking his head against the concrete in the cell including the concrete bed. A medical "code" was called at 7:35 a.m. in response to his deteriorating condition. For four hours, multiple security personnel restrained Mr. Ramirez on the floor. During this crisis, correctional officers repeatedly called for medical assistance. None came. Instead, they were forced to hold Mr. Ramirez down as he thrashed, moaned, screamed incoherently, and struck his head against the concrete multiple times. When supervising nurse Joseph R. Bounds, RN (hereinafter "Defendant Bounds"), finally arrived on the scene hours later, he refused the requests to have Mr. Ramirez transported to a hospital.

Knowing full well that Mr. Ramirez could not speak, Defendant Bounds insisted that Mr. Ramirez verbally requested a transfer to the hospital. During the interaction with Mr. Ramirez, Defendant Bounds did not examine Mr. Ramirez even for the purpose of obtaining vital signs or to assess his open, bleeding wounds. Instead, having provided no medical care of any kind, Defendant Bounds simply left, telling the security personnel to contact him once Mr. Ramirez "was with it enough" to verbally request a transfer to the hospital, which Mr. Ramirez was apparently never able to do. The security personnel were forced to keep Mr. Ramirez pinned to the floor until after 1:15 PM, when Mr. Ramirez was finally transferred to Cibola General Hospital.

Defendant Bounds testified that he understood CoreCivic's policy to be that a detainee was never to be sent to the hospital for treatment by any member of the medical staff. According to Bounds' testimony, only the medical director could make that decision. According to CCCC records, the medical director Keith Ivens, MD ("Defendant Ivens"), who served as the facility's physician, never personally examined Mr. Ramirez. Nevertheless, Defendant Ivens refused pleas from staff to have Mr. Ramirez transported to a local hospital, stating that James was "a security issue now."

Once at Cibola General Hospital, instead of being treated as a patient in need of medical care, Mr. Ramirez continued to be marginalized. Emergency department physician Joshua Larson, MD ("Defendant Larson") took no psychological history, did not conduct any psychological testing, did not call in a psychiatrist or other mental health professional, and did not conduct any toxicology studies or other blood testing to determine the cause of Mr. Ramirez's bizarre behavior, which included, to Defendants Larson's and Cibola General's knowledge, repeatedly smashing his face on the concrete. Instead, Mr. Ramirez was sedated with multiple doses of Ativan, Haldol, and Ketamine intravenously so that cursory imaging studies could be performed before clearing Mr. Ramirez to return to CCCC.  Without further testing or observation, despite concerning vital signs, Mr. Ramirez was sent back to CCCC. Upon his arrival at CCCC, James was still heavily sedated and could not sit up. After falling out of his wheelchair, medical staff attempting to take his vital signs and secured him to a gurney. By all accounts, Mr. Ramirez was incoherent, mentally, and physically incapacitated, and unable to express his needs. Rather than keeping Mr. Ramirez in the medical unit for observation, Defendant Ivens unilaterally directed Mr. Ramirez to a solitary cell with no medical oversight whatsoever.

This was not the first time Mr. Ramirez had been placed in solitary without proper procedure being followed. On February 9, 2022, Mr. Ramirez was placed in solitary by CoreCivic. His recent evaluation as being mentally unfit to stand trial and his psychiatric diagnosis were specifically denied by CoreCivic staff.

Defendants knew of Mr. Ramirez's vulnerable mental state. Moreover, Defendants were acutely aware of the flow of illicit drugs into the facility. When Defendants Ivens and Bounds were called on to provide reasonable and adequate medical intervention to Mr. Ramirez on February 14, 2022, they both abdicated their duties, reasoning that Mr. Ramirez had simply ingested drugs and did not need medical intervention. Neither Defendant ever responded to Mr. Ramirez, a man in acute mental and physical distress, as a reasonable health care provider would.

Even more alarming, Defendants Ivens and Bounds seemed to be acting to protect CoreCivic's interests above their patient's. By intentionally withholding any testing of Mr. Ramirez that would have provided a roadmap for how to address his suspected exposure and potential overdose, Defendants Bounds and Ivens destroyed Mr. Ramirez's opportunity to show what substance he had been exposed to on CoreCivic's watch.

## II.    PARTIES, JURISDICTION, AND VENUE

1.      Mr. Ramirez died on February 15, 2022, in Cibola County, New Mexico.

2.      At all relevant times, and at the time of his death, Mr. Ramirez was a pre-trial detainee at the Cibola County Correctional Center ("CCCC") in Cibola County, New Mexico. Days before his death, Mr. Ramirez had been determined to be unfit to stand trial due to his mental instability.

3.     Plaintiff, Eugenio Mathis, was appointed Personal Representative of the Estate of Mr. Ramirez, deceased ("Estate"), on May 23, 2022, and is a resident of San Miguel County, New Mexico.

4.     Plaintiff brings this action on behalf of the Estate.

5.     Defendant CoreCivic of Tennessee, a/k/a CoreCivic, Inc. (hereinafter "CoreCivic") is a foreign for-profit corporation registered to do business in New Mexico with a registered agent for service of process at 2201 San Pedro NE, Bldg. 3 #200, Albuquerque, New Mexico 87110.

6.     At all times relevant, Defendant CoreCivic operated, supervised, directed, and controlled CCCC, including the operation of medical services..

7.     At all times relevant to this Amended Complaint, Defendant CoreCivic acted through its owners, officers, directors, employees, agents, or apparent agents, including but not limited to administrators, management, nurses, nurse practitioners, doctors, technicians, and other staff personnel and is responsible for their acts or omissions pursuant to the doctrines of *respondeat superior*, agency or apparent agency.

8.     All tortious conduct of individual Defendant Bounds hereinafter alleged is imputed to Defendant CoreCivic as a matter of law (collectively, "CCCC Defendants").

9.     Defendant Correctional Medicine Associates, Inc., ("CMA") is a foreign for-profit corporation headquartered at 10 Burton Hills Boulevard, Nashville, TN 37215.

10.     Defendant CMA is in the business of providing healthcare to incarcerated individuals, including those incarcerated at CCCC.

11.     Upon information and belief, CMA is operated jointly with CoreCivic.

12.     All tortious conduct of Defendant Ivens hereinafter alleged is imputed to Defendants CMA and CoreCivic as a matter of law.

13.     Defendant Cibola General Hospital, Inc. (hereinafter, "CGH" or "Cibola General") is a domestic corporation with a principal place of business at 1016 E. Roosevelt Ave., Grants, NM 87020.

14.     At all times relevant, Cibola General operated, supervised, directed, and controlled Cibola General Hospital, located in Grants, New Mexico.

15.     At all times relevant, Cibola General acted through its owners, officers, directors, employees, agents, or apparent agents, including but not limited to administrators, management, nurses, nurse practitioners, doctors, technicians, and other staff personnel and is responsible for their acts or omissions pursuant to the doctrines of *respondeat superior*, agency or apparent agency.

16.     All tortious conduct of individual Joshua Larson, MD, hereinafter alleged is imputed to Cibola General as a matter of law (collectively, "Cibola General Defendants").

17.     At all times material to this Complaint, Defendant Bounds, RN, was an employee of CoreCivic acting within the course and scope of his agency as a registered nurse.

18.     Defendant Larson, was, at all times material, an employee of Cibola General Hospital, was acting within the course and scope of his agency as a medical doctor.

19.     Upon information and belief, Keith Ivens, M.D., was the chief medical officer of CMA and medical director of CoreCivic. Defendant Ivans was also apparently the only on-call physician at CCCC on February 14 and 15, 2022. Defendant Ivens was, at all times material, an employee and/or agent of CMA and CoreCivic, acting within the course and scope of his agency as a medical doctor and as the chief medical officer of CMA and CoreCivic medical operations.

20.     This Court has jurisdiction over the subject matter of and the parties to this action under NMSA 1978, Sections 38-3-1.

### III.    STATEMENT OF FACTS

**A.    Incarceration at CCCC**

21.    At times relevant to this Complaint, and at the time of his death at age 28, Mr. Ramirez was a pre-trial detainee at CCCC in Milan, New Mexico, under the supervision and control of CoreCivic.

22.    On September 7, 2021, Mr. Ramirez was taken into the custody of CCCC after being on a mental health "Hold" at Bernalillo County Metropolitan Detention Center.

23.    Mr. Ramirez passed away on February 15, 2022, at the age of 28.

24.    Upon information and belief, at an intake assessment on September 8, 2021, Mr. Ramirez reported existing diagnoses, treatment, and hospitalization for schizophrenia.

25.    Upon information and belief, Mr. Ramirez was evaluated by a forensic psychologist in November 2021 and was determined to be mentally unfit to stand trial.

26.    Upon information and belief, all Defendants were aware of these findings and diagnoses as Defendants CoreCivic and CMA medical personnel both diagnosed and/or treated Mr. Ramirez for paranoid schizophrenia.   CCCC medical records indicate that Mr. Ramirez hallucinated and heard voices of the "Predator."

27.    Upon information and belief, Mr. Ramirez also reported a recent surgery for multiple gunshot wounds.

28.    Upon information and belief, on October 25, 2021, Mr. Ramirez complained to CoreCivic employee Nurse McGowan, R.N. of pain due to retained bullet fragments in his right lung, left armpit, left bicep, right knee, right inner thigh, inner left thigh, and above his left knee.

29.    Upon information and belief, Mr. Ramirez requested that the bullets be removed but they were never removed prior to Mr. Ramirez' death.

30.     As a result, these fragments caused Mr. Ramirez significant pain and suffering throughout his incarceration at CCCC. Upon information and belief, Defendants CoreCivic and/or CMA medical personnel provided no pain management of any kind other than ibuprofen.

31.     Upon information and belief, on or around October 29, 2021, November 16, 2021, and January 12, 2022, Mr. Ramirez told Defendants CoreCivic and/or CMA employees, agents, and/or contractors [unknown first name] Nelson…, and [unknown first name] Dunning ADO or [unknown first name] Mirabal, respectively, that he feared for his life due to threats from other prisoners.  Defendants dismissed his concerns as paranoia, but accommodated Mr. Ramirez's request for re-location each time. No medical, mental health, or psychiatric referral of any kind was ordered.

32.     Mr. Ramirez's paranoia warranted a psychological re-evaluation to determine if his fears were justified or a product of his paranoid schizophrenia.

33.     Instead, on February 9, 2022, he was placed in solitary confinement..

34.     A cursory review of his segregation was approved without the requisite medical and mental health risk assessment. .

35.     The solitary confinement likely exacerbated Mr. Ramirez's already severe mental health issues.

36.     Confinement records show that Mr. Ramirez was not afforded recreation time and did not shower for the most part.

37.     Medication logs reveal that Mr. Ramirez received less than half the prescribed doses of his anti-psychotic medications.

38.     Upon information and belief, on the morning of February 14, 2022, prior to his transfer by U.S. Marshals, Mr. Ramirez began to suffer from a severe medical and/or mental health episode.

39.     Around 7:35 AM., a medical response was called because Mr. Ramirez was behaving erratically, speaking incoherently, and had a busted lip from where he had fallen in his cell.

40.     Nursing staff requested that a urinalysis be performed to determine if Mr. Ramirez was under the influence of a potentially dangerous substance.

41.     Supervising Officer [first name unknown] Bullock refused to conduct the test, stating that his shift was already over.

42.     Mr. Ramirez was escorted to a medical observation cell and placed on a thirty-minute watch.

43.     As evidenced by CoreCivic security video, at approximately 9:00 a.m., Mr. Ramirez repeatedly fell, hitting the concrete bed, the sink, the walls, and the floor numerous times, causing him significant physical injuries. Medical and security staff did not enter his cell until approximately 9:26 a.m. By this time, both Mr. Ramirez and the cell were covered in blood.

44.     From the outset, when the guards entered his medical observation cell, there were a minimum of three guards in the cell restraining Mr. Ramirez.

45.     Mr. Ramirez was pinned to the floor with hard restraints on his ankles and wrists and a makeshift soft head brace.

46.     Despite these restraints, Mr. Ramirez continued to thrash and free his head from the brace. He continued to strike his head against the walls and the floor. He attempted to bite the flesh of his own hands. The forced restraint of Mr. Ramirez would go on for nearly five hours while

security staff waited for medical staff with CoreCivic and CMA to direct proper medical intervention.

47.    As evidenced by the disturbing video taken of Mr. Ramirez's crisis, a male officer asked a female who had stepped into Mr. Ramirez's cell to call for someone from medical.

48.    A few minutes later, a female officer stated that she was going to try to find "Bounds," referring to Defendant Joseph Bounds.

49.    As Mr. Ramirez continued to intermittently thrash, moan, and scream incoherently, the male officer asked the female if medical was going to give Mr. Ramirez something to calm him down. She replied that medical [staff] "just wants to wait it out."

50.    The medical staff referred to includes Defendants Ivens and Bounds, who supervised the CCCC medical staff.

51.    Around twenty minutes later, a male officer asked a female officer if she had heard from medical. She called Defendant Bounds, who apparently was not at CCCC at this time, who stated that he had not heard anything about the ongoing situation with Mr. Ramirez and that the officers would probably have to use restraints.

52.    The woman additionally stated that she told Defendant Bounds that if anything were to happen to Mr. Ramirez, there was not a nurse on site to assist.

53.    By this time, Mr. Ramirez had open wounds on his lip and head which were bleeding all over the floor and throughout the cell. Officers restraining Mr. Ramirez did their best to continuously wipe his blood from his face and eyes with gauze.

54.    At one point, a woman states that "they" think Mr. Ramirez is malingering and is behaving this way to avoid going to court. It is not clear who "they" is.

55.     Around the same time, a male officer asked a female officer to find Defendant Bounds because the officers just sitting there restraining Mr. Ramirez was not helping and "this guy needs to go to the hospital."

56.     A few moments later, a female entered and stated that Defendant Bounds was busy on a conference call. This individual then remarked that "Bounds is always on conference calls."

57.     Another woman stated that she would call Defendant Bounds because Mr. Ramirez really needed a sedative.

58.     Throughout this time, the officers expressed their frustration at not being able to reach Defendant Bounds or anyone from medical to assist.

59.     One female stated that she would call Dr. Ivens, but another stated that Defendant Bounds is supposed to make that call to Dr. Ivens.  A third officer asks, "what are we supposed to do, just wait for Bounds?"

60.     At this point, it had been two or three hours since the security officers had started calling medical for help.

61.     One officer even stated that "this is crazy."

62.     About thirty minutes later, a male officer asked if they had heard anything from medical, to which another male officer responded "no."

63.     Finally, Defendant Bounds arrived at Mr. Ramirez's cell. Bounds repeatedly asked Mr. Ramirez to identify himself. Mr. Ramirez was clearly incoherent and could not.

64.     Bounds then explained to the officers restraining Mr. Ramirez that "as soon as he [Mr. Ramirez] is with it enough that he can say, 'I give you guys permission to take me to the hospital,' he can go get his lip sutured and then they'll evaluate him and treat him from there […]If

you just talk to me, we can get you to the hospital and get you fixed up real quick, they [the hospital] have better drugs than we do."

65.    As Defendant Bounds left the cell, with officers still restraining Mr. Ramirez to prevent further injury, Defendant Bounds stated that he thought Mr. Ramirez was "on drugs anyway."

66.    Defendant Bounds then stated that if things did not improve after an hour, even though the medical/mental health episode had been ongoing for four hours at this point, that he would talk to Dr. Ivens. He stated that he would see if he could play the "emergency card."

67.    According to a statement from Supervising CO Snodgrass, Ivens initially dismissed the crisis that was unfolding with Mr. Ramirez, stating "he's a security issue now."

68.    Upon information and belief, Defendant Ivens ultimately directed that Mr. Ramirez, who was incapacitated and incoherent, needed to give verbal consent before Defendant Ivens would sign an order sending Mr. Ramirez to the hospital.

69.    Defendant Bounds testified that Defendant Ivens thought Mr. Ramirez was on drugs, despite Defendant Ivens never personally seeing or assessing Mr. Ramirez that day.

70.    According to testimony by Defendant Bounds, CCCC employees understood that it was CoreCivic policy that medical and security staff could not send an inmate to the hospital for medical treatment without Defendant Ivens' permission.

71.    Defendant CoreCivic's policy prohibiting an employee, staff, or medical personnel to send an inmate to the hospital without the medical director's permission, even in cases of obvious emergency such as Mr. Ramirez's, demonstrates CoreCivic and CMA custom and practice of unreasonably preventing detainees experiencing a serious medical or mental health issue from receiving appropriate and necessary medical treatment.

72.    Defendant Ivens withheld all medical intervention and treatment from Mr. Ramirez.

73.    As CCCC's only full time, "on-site" physician, Defendant Ivens never inquired as to Mr. Ramirez's vitals or asked to observe Mr. Ramirez directly.

74.    For five excruciating hours, Defendant Ivens prevented staff on the scene (who were dealing first-hand with Mr. Ramirez's medical emergency—keeping him from fracturing his skull on the floor, wiping blood spewing from his lip, etc.), from taking appropriate action to have Mr. Ramirez seen and treated by a qualified health care provider.

75.    As with Defendant Ivens, Defendant Bounds did not evaluate Mr. Ramirez.

76.    As with Defendant Ivens, Defendant Bounds did not perform any testing or diagnostics.

77.    As with Defendant Ivens, Defendant Bounds did not even take or inquire about Mr. Ramirez' vital signs.

78.    Defendant Bounds simply walked away from Mr. Ramirez, leaving him incoherent and bleeding, in a severe medical and psychiatric crisis, pinned to the floor by multiple security officers.

79.    Defendant Ivens never came to the cell and Defendant Bounds never returned to see Mr. Ramirez over the next hour and a half.

80.    Instead, the officers were left alone with Mr. Ramirez with no medical assistance. They continued to restrain Mr. Ramirez and tried to get him to verbalize that he wanted to go to the hospital.  Mr. Ramirez could not answer.

81.    Just after 1:00 PM., nearly six hours after the incident began, Mr. Ramirez was finally referred to an outside medical facility, Cibola General Hospital, for further treatment.

82.     When Mr. Ramirez returned to CCCC on the evening of February 14, 2022, still incoherent, unable to communicate, and severely compromised by the sedatives that had been pumped into him at Cibola General, Defendant Ivens withdrew all chance of medical oversight and care from Mr. Ramirez by putting him into solitary confinement, away from medical staff.

83.     Although there is video of Mr. Ramirez being wheeled by medical staff to his solitary cell at approximately 8:00 PM on February 14, 2025, any further encounters with medical staff are absent from the record, until after Mr. Ramirez was found dead on the following afternoon.

84.     Even when medical staff attempted to check on Mr. Ramirez in solitary during the night of February 14 and morning of February 15, they were told by officers in the restricted housing unit that it was not safe to enter Mr. Ramirez's cell.

85.     The overall lack of transparency among CoreCivic and its officers suggests there was more to what happened to Mr. Ramirez prior to his death than has been disclosed.

86.     After Mr. Ramirez's death, the Office of the Medical Investigator (OMI) identified the following injuries to Mr. Ramirez:

    I. Blunt trauma, minor
      A. Head and neck
        1. Fracture, nasal bone
        2. Lacerations
          i. Lips
          ii. Forehead
        3. Contusions involving the face and head
        4. Abrasions involving the face
        5. Bilateral periorbital ecchymoses
        6. Subscapular hemorrhage
          i. Frontal scalp
          ii. Temporal scalp, bilateral
        7. Subgaleal hemorrhage
          i. Temporal skull, bilateral
          ii. Parietal skull, bilateral
        8. Hemorrhage
          i. Temporal muscle, bilateral
          ii. Right side of neck, soft tissue

14

87.     CCCC has a pattern and practice of failing to provide life-saving treatment, and medical neglect.

88.     CCCC did not meet that standards for the National Commission on Correctional Health Care or the Joint Commission.

89.     Defendant CMA advertises that is provides quality health care services to incarcerated individuals, including providing turn-key solutions for mental health, physical health, pharmaceuticals, labs, staffing, and training in the correctional industry.

90.     Defendant CMA has a pattern and practice of failing to provide proper medical treatment to inmates.

91.     Defendant CMA apparently failed to properly train Defendant Ivens on his duty to respond to inmate crises and to provide adequate and reasonable treatment and medical care.


**B.    Illicit Drugs**

92.     In recent years, CCCC has become notorious for drug trafficking and widespread drug use among inmates.

93.     CCCC's issues with drugs became so severe that federal judges in the District of New Mexico and the United States Marshals Service brought their concerns to the United States Attorneys' Office and the Federal Bureau of Investigation (FBI).

94.     The FBI Albuquerque Division Violent Gang Task Force investigated the CCCC and uncovered a complex and lucrative drug trafficking network within CCCC.

95.     Specifically, members of prison gangs at CCCC had been working with associates outside of prison, along with CCCC employees, to smuggle drugs and other contraband into CCCC.

96.     According to a search warrant affidavit, FBI Special Agent Jordan Spaeth found that the CCCC's drug problem was a "startling anomaly" among New Mexico's detention centers due to the "sheer volume of controlled substances being trafficked within the facility."

97.     In 2021, multiple instances were recorded in which tennis balls containing drugs were thrown over the fence of CCCC from outsiders. On at least one occasion, inmates were able to recover the drugs. It is believed that because of the proximity of CCCC to public roadways, this type of activity is common, but usually goes undetected.

98.     Upon information and belief, CCCC employees have been responsible for drugs and contraband entering CCCC as well.

99.     On August 29, 2023, former CCCC Correction Officer (CO) Dennis Dean Garcia was sentenced to 24 months of imprisonment followed by three years of supervised release for attempting to provide contraband in prison.[1]

100.    Garcia, who was employed as a corrections officer at CCC from January 2019 until February 22, 2021, had been indicted by a federal grand jury on charges of possession with intent to distribute 50 grams and more of methamphetamine and attempt to provide contraband in prison after monitors of surveillance video at CCCC observed Garcia remove something from his pocket and place it in a storage room. The item contained 104 grams of methamphetamine.[2]

101.    During the FBI's investigation of CCCC, investigators were told by approximately two dozen sources from within the facility that certain corrupt COs would regularly smuggle drugs and other contraband into CCCC for inmates.

---

[1] *See* Press Release, *Former USMS Detention Officer Sentenced for Attempt to Provide Contraband in Prison*, U.S. Dept. of Justice, Office of the Inspector General (Aug. 29, 2023), https://oig.justice.gov/news/press-release/former-usms-detention-officer-sentenced-attempt-provide-contraband-prison.
[2] *See* Press Release, *Former corrections officer arraigned on drug trafficking and contraband charges*, U.S. Attorney's Office, District of New Mexico (Feb. 3, 2022), https://www.justice.gov/usao-nm/pr/former-corrections-officer-arraigned-drug-trafficking-and-contraband-charges.

102.    One source reported knowing a CO who would hide drugs in his boot to bring them into CCCC. The CO would then deliver the drugs to an inmate by dropping the package into the cell during a "search," outside the view of surveillance cameras.

103.    FBI investigators also learned of a former captain and shift supervisor at CCCC who had been actively involved in drug trafficking while at CCCC. Allegedly, the captain worked with several porters—inmates who would distribute drugs around the facility. When drugs were found in an inmate's cell by COs, this Captain directed the officers to refrain from field testing the drugs, and the Captain deleted photo and video evidence of the drugs.

104.    The transfer of drugs and other contraband is sometimes achieved by hiding the contraband inside food carts. CCCC facilitates distribution of contraband by permitting the free movement of carts between pods without supervision.

105.    On November 1, 2024, the U.S. Attorney's Office, District of New Mexico, announced a major "dismantling" of the drug trafficking network associated with CCCC.[1] The joint operation included multiple search warrants, indictments, and arrests.

106.    On January 25, 2025, Michael "Gomer" Ernest Garcia was arrested in connection with the FBI investigation of drug trafficking at CCCC.[2]

107.    Upon information and belief, multiple individuals in CCCC custody have lost their lives in recent years due to drugs that were brought into CCCC illegally. In June 2021, a male detainee was discovered dead in his cell at CCCC. The Office of Medical Investigator (OMI)

---

[1] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Target Drug Trafficking Operation Linked to Federal Correctional Facility,* U.S. Attorney's Office, District of New Mexico (Nov. 1, 2024), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-target-drug-trafficking-operation-linked-federal-0.
[2] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Disrupt Contraband Operation at Cibola County Correctional Center with Arrest,* U.S. Attorney's Office, District of New Mexico (Jan. 25, 2025), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-disrupt-contraband-operation-cibola-county-correctional.

determined that this detainee died from the toxic effects of fentanyl, methamphetamine, and morphine. On November 14, 2021, Jasmine Williams was discovered dead in her cell. Her death was also determined to be caused by the toxic effects of fentanyl and other drugs.

108.    Following the autopsy of Mr. Ramirez, toxicology labs revealed that Mr. Ramirez may have had phencyclidine (PCP) in his system.

109.    Defendants failed to provide timely and adequate medical care to Mr. Ramirez because they assumed without any medical confirmation that Mr. Ramirez had "taken something," done drugs, or was otherwise intoxicated.

110.    Even if Mr. Ramirez had been exposed to an illicit substance, Defendants owed a duty of care to care for him.

111.    Defendants also owed a duty to provide a safe environment for its detainee, Mr. Ramirez, a vulnerable person with a diagnosed mental illness.

112.    Defendants CoreCivic, Bounds, and Ivens were aware of the infiltration of illicit drugs into CCCC, but failed to respond appropriately.

113.    Defendant CoreCivic failed to properly implement appropriate security measures, safeguards, and protocols to keep the flow of illicit drugs out of the facility.

114.    <u>Defendants assumed without confirmation that Mr. Ramirez had ingested illicit drugs, and as a result, did nothing but restrain him during his medical and mental health crisis.</u>

**C.    Cibola General Hospital**

115.    Upon transport to Cibola General, Mr. Ramirez was seen by Joshua Larson, M.D.

116.    The chief complaint is stated as "Brought in by corrections by repeatedly smashing face on concrete. Altered mental status, baseball sized lump on forehead, laceration to right side of head."

117.    Mr. Ramirez's medical records also note that he appeared to be intoxicated, but it was unclear what substance he had used, if any.

118.    Yet, despite believing that Mr. Ramirez was intoxicated, upon information and belief, Defendant Larson did not order any blood tests, toxicology, drug tests or drug screens.

119.    Without performing a toxicology screening, Defendant Larson ordered that Mr. Ramirez be administered multiple doses of Ativan and Haldol, which did not calm Mr. Ramirez down. Finally, Defendant Larson ordered Ketamine intravenously, and Mr. Ramirez underwent a CT scan.

120.    Remarkably, Defendant Larson stated that Mr. Ramirez was alert and oriented with no motor or sensory changes.

121.    Remarkably, Defendant Larson also stated that Mr. Ramirez was cooperative with an appropriate mood and affect.

122.    Yet, a nurse stated that she could not obtain any information from Mr. Ramirez due to cognitive impairment.

123.    Defendant Larson admitted that the medical records were a template, with information already inserted.

124.    This nurse also calculated that Mr. Ramirez had a Glasgow coma scale of 13, indicating he had likely suffered a traumatic brain injury.

125.    Knowing that Mr. Ramirez had a history of schizophrenia and had been smashing his face repeatedly on the concrete, Defendant Larson did not call in or refer Mr. Ramirez to a mental health professional to evaluate Mr. Ramirez for his severe mental health crisis.

126.    It does not appear that Defendant Larson took any notes on, or inquired into Mr. Ramirez psychiatric history, his currently prescribed psychiatric medications, the

circumstances related to smashing his face on the concrete repeatedly, or the fact that Mr. Ramirez had to be restrained by numerous correctional officers for close to 5 hours prior to transfer to Cibola General.

127.    Defendant Larson did not consult with Defendants Bounds, Ivens, or any other CoreCivic medical personnel. Likewise, it does not appear that any CoreCivic medical personnel attempted to consult with Defendant Larson.

128.    Instead, Mr. Ramirez was given only a physical examination, provided patient education materials and prescriptions and sent back to the correctional facility.

129.    Mr. Ramirez likely never reviewed these materials due to his condition.

130.    Mr. Ramirez did not sign any paperwork form Cibola General, likely due to the inability to do so.

131.    Mr. Ramirez's discharge instructions directed him to "follow up with his primary care provider within 1 to 2 days" and to seek care if his condition worsened. Mr. Ramirez likely never read these instructions.

132.    Mr. Ramirez died less than 24 hours following his visit to Cibola General.

## CAUSES OF ACTION

### COUNT I MEDICAL MALPRACTICE
### (CoreCivic, Cibola General Hospital, and CMA)

133.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the paragraphs above.

134.    At all relevant times, CoreCivic, Cibola General, and CMA, acting through their employees, agents, apparent agents, and/or contractors, were negligent in the medical care and services they provided to Mr. Ramirez.

135.    In undertaking the diagnosis, care and treatment of Mr. Ramirez, CoreCivic, Cibola General, and CMA,, by and through their respective employees, staff, and agents, had a duty to possess and apply the knowledge, skill, and care that is used by reasonably well-operated medical facilities and well-qualified healthcare providers under similar circumstances, giving due consideration to the locality involved, CoreCivic, Cibola General, and CMA, and their respective employees, staff, and agents, breached their duties owed to Mr. Ramirez and committed medical malpractice and were negligent in the management of his health and well-being.

136.    CoreCivic's and CMA's negligence includes, but is not limited to:

a.    Failure to implement adequate staffing levels and adequately trained staff at CCCC to care for detainees with full knowledge that such inadequate staffing practices would place detainees such as Mr. Ramirez at risk for injury and death;

b.    Negligently hiring, retaining, and/or supervising staff at CCCC, or that worked at CCCC, with full knowledge that such staffing practices would place detainees such as Mr. Ramirez at risk for injury and death;

c.    Failure to implement proper mental health crises management protocols and/or to follow mental health crises management protocols, including mental health supervision, assessment, monitoring, and training, such that Mr. Ramirez died without proper monitoring, prevention, and treatment;

d.    Failure to provide and implement proper care plans that would have addressed Mr. Ramirez's medical needs;

e.    Failure to provide a safe environment for detainees, including Mr. Ramirez;

f.    Failure to recognize Mr. Ramirez's emergent need for medical care and/or a higher level of medical care than could be provided at CCCC; and

g.    Failure to provide adequately trained physicians to work at CCCC.

137.    Cibola General's negligence includes, but is not limited to:

a.    Failure to properly supervise its medical personnel,

b.    Failure to evaluate, treat, and manage Mr. Ramirez's medical condition;

c.    Failure to take the reasonable steps to acquire proper treatment of Mr. Ramirez in light of his vulnerable state; and

d.    Failure to protect and preserve Mr. Ramirez's health.

138.    CoreCivic, Cibola General, and CMA,, through their employees, agents, and contractors, breached their duties and were, at a minimum, negligent in the diagnosis, treatment, and management of Mr. Ramirez's health and safety.

139.    These acts and failures to act by CoreCivic, Cibola General, and CMA, by and through their employees, agents, and contractors, were willful, wanton, and in reckless disregard for Mr. Ramirez's safety and well-being.

140.    All acts and/or omissions of CoreCivic, Cibola General, and CMA, by and through their employees, agents, and contractors, were done within the scope of its employment, agency, or contract.

141.    All acts complained of herein were authorized, participated in, or ratified by CoreCivic, Cibola General, and CMA, and/or their administrators, managers, officers, directors, or shareholders.

142.    As a direct and proximate result of the negligent acts and omissions by CoreCivic, Cibola General, and CMA, and their employees, staff and agents, Mr. Ramirez suffered a rapid deterioration in his health, along with physical, emotional, and psychological pain and suffering not presently determinable, but to be proven at the time of trial.

143.     As a direct and proximate result of the negligent acts and omissions by CoreCivic, Cibola General, and CMA, and their employees, staff and agents, Mr. Ramirez suffered and unnecessary, avoidable, and wrongful death.

144.     CoreCivic, Cibola General, and CMA's failure to assess, treat, and manage Mr. Ramirez's medical condition by and through their employees, staff, and/or agents was reckless and wanton with utter disregard for the safety and welfare of Mr. Ramirez, for which Plaintiff is entitled to punitive damages.

## COUNT II NEGLIGENCE
### (CoreCivic, Cibola General, and CMA,)

145.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the paragraphs above.

146.     Defendants owed a duty of ordinary care to Mr. Ramirez.

147.     Defendants, their employees, staff, and / or agents failed to use ordinary care in furnishing health care treatment for Mr. Ramirez, thereby causing him injury, damage, and death.

148.     Defendants CoreCivic, Cibola General, and CMA, breached their duties and were, at minimum, negligent in the diagnosis, treatment, and management of Mr. Ramirez's health and safety.

149.     At all times relevant herein, the relationship of doctor-patient and medical provider-patient existed between Mr. Ramirez and Defendants CoreCivic, Cibola General, and CMA.

150.     At all times relevant herein, Defendants CoreCivic, Cibola General, and CMA expressly and impliedly warranted to Mr. Ramirez that everything necessary and proper were being done by them for him to maintain his health; however, Defendants breached said warranties.

151.     Defendants CoreCivic, Cibola General, and CMA had a duty to exercise reasonable care to protect Mr. Ramirez from harm, including harm from dangerous drugs.

152.    Defendants CoreCivic, Cibola General, and CMA breached that duty by allowing, failing to stop, and/or facilitating the smuggling of dangerous drugs that they allege Mr. Ramirez ingested.

153.    Defendants CoreCivic, Cibola General, and CMA negligence actually and proximately caused Mr. Ramirez's injuries and damages, and/or death.

154.    Defendants CoreCivic, Cibola General, and CMA are responsible for the damages allowed by law to Mr. Ramirez.

155.    As a direct and proximate result of the negligence by Defendant. CoreCivic, Cibola General, and CMA, Mr. Ramirez suffered physical injuries, pain and suffering, loss of enjoyment of life, and death.

156.    Defendants CoreCivic, Cibola General, and CMA's negligence was wanton, willful, reckless, and malicious, allowing for an award of punitive damages against Defendants.

157.    Defendants CoreCivic, Cibola General, and CMA are liable for their employees' negligence.

## COUNT III MEDICAL MALPRACTICE
### (Joseph Bounds, RN, Joshua Larson, M.D., and Keith Ivens, M.D.)

158.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the paragraphs above.

159.    Defendants Bounds, Larson, and Ivens owed a duty to possess and apply the knowledge, skill and care that is used by reasonably well-qualified healthcare providers under similar circumstances, giving due consideration to the locality involved.

160.    Defendants Bounds, Larson, and Ivens breached their duties owed to Mr. Ramirez and committed medical malpractice.

24

161.    Defendants Bounds and Ivens recklessly failed to provide any medical care or psychiatric care at all to Mr. Ramirez, a detainee in CoreCivic custody with known diagnosis of schizophrenia, despite an acute and severe medical and psychiatric crisis which included physical injuries.

162.    Joshua Larson, M.D. was at a minimum negligent in the provision of medical care to Mr. Ramirez despite an acute and severe medical and psychiatric crisis.

163.    Joshua Larson, M.D. recklessly failed to provide any significant medical intervention for Mr. Ramirez' acute and severe medical and psychiatric crisis.

164.    Joshua Larson, M.D. failed to order or conduct any toxicology despite suspicions of adverse psychiatric consequences from drug use.

165.    Joshua Larson, M.D. failed to order or conduct any toxicology prior to administering Ativan, Haldol, and Ketamine to determine possible drug interaction risks.

166.    Joshua Larson, M.D. failed to order or conduct any toxicology to ascertain possible adverse drug interactions from the cocktail of drugs prescribed by CoreCivic medical personnel.

167.    Joshua Larson, M.D. failed to even attempt to make a psychiatric referral to determine what had caused and continued to cause Mr. Ramirez's bizarre behavior, so-called smashing his face against the concrete or inability to communicate.

168.    The actions and inactions of Joshua Larson were grossly negligent, reckless, and callously indifferent to the medical and psychiatric needs of Mr. Ramirez.

## COUNT IV NEGLIGENCE
### (Joseph Bounds, NP, Joshua Larson, and Keith Ivens)

169.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the paragraphs above.

170.    Defendants Larson, and Ivens owed a duty of ordinary care to Mr. Ramirez.

171.    Defendants Bounds, Larson, and Ivens failed to use ordinary care in furnishing health care treatment for Mr. Ramirez, thereby causing him injury, damage, and death.

172.    Defendants Bounds, Larson, and Ivens breached their duty of ordinary care, including but not limited to:

a.    Failing to provide any medical care or psychiatric care at all to Mr. Ramirez despite an acute and severe medical and psychiatric crisis which included physical injuries.

b.    Failing to provide medical care to Mr. Ramirez despite an acute and severe medical and psychiatric crisis.

c.    Failing to provide any significant medical intervention for Mr. Ramirez' acute and severe medical and psychiatric crisis.

d.    Failing to order or conduct any toxicology despite suspicions of adverse psychiatric consequences from drug use.

e.    Failing to order or conduct any toxicology prior to administering Ativan, Haldol, and Ketamine to determine possible drug interaction risks.

f.    Failing to order or conduct any toxicology to ascertain possible adverse drug interactions from the cocktail of drugs prescribed by CoreCivic medical personnel.

g.    Failing to even attempt to make a psychiatric referral to determine what had caused and continued to cause Mr. Ramirez's bizarre behavior, so-called smashing his face against the concrete or inability to communicate.

173.    Defendants Bounds, Larson, and Ivens breached their duties and were negligent in the diagnosis, treatment, and management of Mr. Ramirez's health and safety.

174.    Defendants Bounds, Larson, and Ivens are jointly and severally liable for the damages allowed by law to Mr. Ramirez.

26

175.    As a direct and proximate result of the negligence by Defendants Bounds, Larson, and Ivens, Mr. Ramirez suffered physical injuries, pain and suffering, loss of enjoyment of life, and death.

176.    Defendants Bounds, Larson, and Ivens negligence was wanton, willful, reckless, and malicious, allowing for an award of punitive damages against Defendants.

## COUNT V NEGLIGENT HIRING, TRAINING AND SUPERVISION
### (CoreCivic and CMA)

177.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the paragraphs above.

178.    CoreCivic and CMA had a duty to properly screen, supervise, educate, and train its employees, agents, and/or contractors regarding the proper treatment of detainees suffering from mental health crises.

179.    CoreCivic and CMA failed to train and supervise its employees, contractors, or agents in such a manner as to accurately assess, treat, and manage detainees experiencing mental health crises, such as Mr. Ramirez, and/or to render aid to prisoners with ongoing and emergent medical conditions.

180.    Upon information and belief, CoreCivic and CMA failed to follow through with or otherwise enforce policies and related contract provisions regarding prisoners with medical issues, which they were responsible for overseeing.

181.    Upon information and belief, CoreCivic and CMA failed to take corrective action against employees, agents, or contractors who it knew were not providing appropriate care in the management of detainees experiencing mental health crises, such as Mr. Ramirez.

182.    CoreCivic and CMA failed to properly screen, supervise, educate, and train its employees, contractors, and agents in the symptoms, diagnosis, treatment, referral, or intervention

27

of medical conditions of detainees and prisoners generally, and specifically Mr. Ramirez's emergent medical condition.

183.    CoreCivic and CMA, in the exercise of reasonable care, should have been aware of the risk of mental health crises to detainees such as Mr. Ramirez and should have protected against the resulting harm by controlling the conduct of its employees, agents, and contractors, over which it had supervisory authority.

184.    CoreCivic and CMA, acting by and through these supervisory actors, failed to use ordinary care in its training, staffing, and supervising practices and had knowledge that its practices created an unreasonable risk of injury to Mr. Ramirez and other similarly situated CCCC detainees.

185.    These dangerous conditions were severe and foreseeable such that CoreCivic and CMA had a duty of care to oversee, discover, and prevent its personnel's dangerous responses to the ongoing management of detainee medical care and medical emergencies.

186.    CoreCivic and CMA's negligent hiring, training, and supervision were the proximate cause of Mr. Ramirez's injuries including, but not limited to, death, pain and suffering, and severe psychological and emotional distress, entitling Plaintiff to compensatory and punitive damages.

187.    The actions and inactions of Joseph Defendant Bounds, NP, Joshua Larson, M.D., were the proximate cause of Mr. Ramirez's injuries including, but not limited to, death, pain and suffering, and severe psychological and emotional distress, entitling Plaintiff to compensatory and punitive damages.

## COUNT VI INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

188.    Plaintiff incorporates by reference as if fully set forth herein, each and every allegation contained in the paragraphs above.

189.    In violation of the New Mexico Constitution, Article II, Sections 4, 8, 13, and 18, CoreCivic and Cibola General, acting by and through their employees, agents, and contractors, engaged in inexplicable dehumanizing, degrading and intentionally cruel, callous, and wanton abuse of Mr. Ramirez as he suffered from a mental health crisis and as he was dying.

190.    The only purpose for this behavior was the intentional infliction of emotional distress on Mr. Ramirez.

191.    All acts complained of herein were authorized, participated in, or ratified by CoreCivic and Cibola General, and/or their administrators, managers, supervisors, officers, directors, or shareholders.

192.    As a result of the foregoing, Mr. Ramirez suffered serious injuries, including death, pain and suffering, and severe psychological and emotional distress, for which Plaintiff is entitled to damages, including punitive damages.

## COUNT VII CIVIL CONSPIRACY TO DENY PLAINTIFF MEDICAL CARE
### (All Defendants)

193.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation contained in the paragraphs above.

194.    The facts illustrated above show a conspiracy on the part of Defendants CoreCivic, CMA and Cibola General, by and through their respective employees, staff, and agents, to deny Mr. Ramirez necessary, proper, and constitutionally minimal medical care.

195.    Defendants CoreCivic, CMA and Cibola General, Bounds, Ivens, and Larson, by and through their respective employees, staff, and agents, conspired to remand Mr. Ramirez's back to CCCC custody without proper evaluation and treatment.

196.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

197.    As a result of said conspiracy, Mr. Ramirez suffered physical injuries, severe emotional and psychological harm, pain and suffering, and death.

198.    Mr. Ramirez's death was caused by Defendants CoreCivic, CMA, and Cibola Hospital, by and through their respective employees, staff, and agents, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

199.    Plaintiff is entitled to recovery for Mr. Ramirez's injuries and damages, including but not limited to physical injuries, pain and suffering, and severe psychological and emotional distress.

200.    Plaintiff is entitled to damages, including punitive damages, against by Defendants CoreCivic, CMA, Cibola Hospital, and their respective employees, staff, and agents.

**WHEREFORE**, PLAINTIFF requests judgment as follows:

A.    Compensatory damages against all Defendants, jointly and severally, in an amount to be determined by this Court as adequate for Mr. Ramirez's pain, suffering, injuries and death;

B.    Compensatory damages against all Defendants, jointly and severally, in an amount to be determined by this Court as adequate for CoreCivic's intentional infliction of emotional distress;

C.    Punitive damages in an as of yet undetermined amount against all Defendants;

D.    Costs incurred by Plaintiff, including pre-judgment and post-judgment interest; and

E.       Such other and further relief as the Court deems just and proper.

Respectfully Submitted:

GUEBERT GENTILE PIAZZA & JUNKER, P.C.


By _____*/s/ Elizabeth M. Piazza*_____
            Elizabeth M. Piazza
            Anne L. Kemp
            P.O. Box 93880
            Albuquerque, NM  87109
            (505) 823-2300
            epiazza@guebertlaw.com
            akemp@geubertlaw.com


-and-

COLLINS & COLLINS, P.C.
            Parrish Collins
            Rebekah Wright
            P. O. Box 506
            Albuquerque, NM  87103
            505-242-5958
            parrish@collinsattorneys.com
            rebekah@collinsattorneys.com

            *Attorneys for Plaintiff*

I HEREBY CERTIFY that on the 15th day of April, 2025, I filed Plaintiff's First Amended Complaint for Medical Malpractice, Wrongful Death, and Related Claims in the State of New Mexico's Odyssey File & Serve system, requesting that the following counsel be served through Odyssey:

Jacob B. Lee
Struck Love Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
(480) 420-1600
jlee@strucklove.com

Deborah D. Wells
Debora J. Moulton
Kennedy, Moulton & Wells, P.C.
2201 San Pedro N.E., Bldg. 3, Suite 200
Albuquerque, NM 87110
(505) 844-7887
ddwells@kmwpc.com
dmoulton@kmwpc.com
*Attorney for Defendants CoreCivic and Joseph Bounds*

Denise M. Chanez
Patrick A. Coronel
Saiz, Chanez, Sherrell + Kaemper, P.C.
5600 Wyoming Blvd., NE Suite 200
Albuquerque, NM 87109
(505) 340-3443
dchanez@sclawnm.com
pcoronel@sclawnm.com
*Attorneys for Cibola General Hospital*

Jessica D. Marshall
Veronica Mireles
Mayer LLP
4101 Indian School Rd. NE, Suite 301N
Albuquerque, NM 87110
(505) 483-1840
jmarshall@mayerllp.com
vmireles@mayerllp.com
*Attorneys for Defendant Joshua Larson*

*/s/ Elizabeth M. Piazza*
_____

SB/7200.035/2025.04.15/Pltf 1st Amended Complaint/jmt

**EXHIBIT B**

**EXHIBIT B**

**STATE OF NEW MEXICO**
**COUNTY OF SAN MIGUEL**
**FOURTH JUDICIAL DISTRICT**

| | |
|---|---|
| **EUGENIO S. MATHIS, as Personal Representative of the ESTATE OF JAMES RAMIREZ, deceased,** | **NO. D-412-CV-2023-00241** |
| **Plaintiff,** | |
| **v.** | |
| **CORECIVIC OF TENNESSEE, d/b/a CORECIVIC, INC.; CIBOLA GENERAL HOSPITAL, INC.; JOSEPH R. BOUNDS, RN; JOSHUA LARSON, MD; CORRECTIONAL MEDICINE ASSOCIATES, P.C. and KEITH IVENS, MD,** | |
| **Defendants.** | |

## NOTICE OF FILING NOTICE OF REMOVAL

Defendants Correctional Medicine Associates, PC, and Keith Ivens, MD (collectively "Removing Defendants"), through undersigned counsel and pursuant to 28 U.S.C. § 1442(a)(1), notify this Court that they filed a Notice of Removal of this action to the United States District Court for the District of New Mexico.

A copy of the Notice of Removal (exclusive of exhibits) is attached as Exhibit A.

Dated: April 25, 2025          */s/ Anne M. Orcutt*
                                DANIEL P. STRUCK, AZ Bar No. 012377
                                JACOB B. LEE, NM Bar No. 154613
                                ANNE M. ORCUTT, AZ Bar No. 029387
                                STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                                3100 West Ray Road, Suite 300
                                Chandler, AZ 85226
                                Tel.: (480) 420-1600
                                Fax: (480) 420-1695

dstruck@strucklove.com
jlee@strucklove.com
aorcutt@strucklove.com

DEBORAH D. WELLS
DEBRA J. MOULTON
KENNEDY, MOULTON & WELLS, P.C.
2201 San Pedro N.E., Bldg. 3, Suite 200
Albuquerque, NM  87110
Tel.: (505) 844-7887
Fax: (505) 844-7123
ddwells@kmwpc.com
dmoulton@kmwpc.com

*Attorneys for Defendants CoreCivic of Tennessee,
d/b/a CoreCivic, Inc., LLC, Joseph R. Bounds, RN,
Correctional Medicine Associates, PC, and Keith
Ivens, MD*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2025, I electronically transmitted the attached document to the Clerk's Office using Odyssey File & Serve E-Filing System for filing and transmittal of a Notice of Electronic Filing to the parties entitled to receive this document via Odyssey File & Serve registrant:

Parrish Collins
Francheska Bardacke
Alysan Boothe Collins
Rebekah Wright
COLLINS & COLLINS, P.C.
P. O. Box 506
Albuquerque, NM 87103
Tel.: (505) 424-5958
parrish@collinsattorneys.com
francheska@collinsattorneys.com
alysan@collinsattorneys.com
rebekah@collinsattorneys.com

Elizabeth M. Piazza
Anne L. Kemp
GUEBERT GENTILE & PIAZZA, PC
P. O. Box 93880
Albuquerque, NM 87109
Tel.: (505) 823-2300
epiazza@guebertlaw.com
akemp@guebertlaw.com

*Attorneys for Plaintiff*

Denise M. Chanez
Patrick A. Coronel
5600 Wyoming Blvd., NE, Suite 200
Albuquerque, NM 87109
Tel.: (505) 340-3443
dchanez@sclawnm.com
pcoronel@sclawnm.com

*Attorneys for Defendant Cibola General Hospital*

3

Jessica D. Marshall
Veronica N. Lewis
9400 Holly Avenue, Bldg. 3
Albuquerque, NM 87122
Tel: (505) 483-1840
jmarshall@mayerllp.com
vlewis@mayerllp.com

*Attorneys for Defendant Joshua Larson, M.D.*

_/s/ Kim Penny_____